FILED

JUL 3 2001

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9               EASTERN DISTRICT OF CALIFORNIA

10

11 KENNETH ARMS TENANT
   ASSOCIATION; MANZANITA ARMS
12 TENANT ASSOCIATION; CALIFORNIA
   COALITION FOR RURAL HOUSING
13 PROJECT; VIRGINIA BREIMANN;
   RITA JANSSEN; SHERRY LAUTSBAUGH;
14 and KATHY POUNDS,
                                    NO. CIV. S-01-832 LKK/JFM
15        Plaintiffs,

16    v.                                O R D E R

17 MEL MARTINEZ, in his official
   capacity as Secretary of the
18 Department of Housing and Urban
   Development; KENNETH ARMS LIMITED
19 PARTNERSHIP; RANCHO ARMS LIMITED
   PARTNERSHIP; SAN JUAN LIMITED
20 PARTNERSHIP; MANZANITA ARMS LIMITED
   PARTNERSHIP; and NATIONAL HOUSING
21 PARTNERSHIP,

22        Defendants.
   _____/
23

24 ////

25 ////

26 ////

1

1    Plaintiffs[1] bring this action against defendants to enjoin the
2  owners of certain apartments from prepaying their mortgages and
3  selling certain HUD subsidized housing.[2]  They also seek
4  declaratory relief against the United States Department of Housing
5  and Urban Development (HUD).  The matter is before the court on
6  plaintiffs' motion for a preliminary injunction.  Also pending
7  before the court is HUD's motion to dismiss or, in the alternative,
8  for summary judgment.  I resolve the matter on the pleadings and
9  evidence filed herein and after oral argument.

10                                I.

11                          **THE COMPLAINT**

12    Between 1972 and 1973, HUD and the defendant Owners ("the
13  Owners") of the subject multi-family dwellings ("the Properties"),[3]

14  ────────────────

15    [1]  The individual named plaintiffs in this action are low-
income, disabled persons.  Plaintiffs, Kenneth Arms Tenants
16  Association and Manzanita Arms Tenants Association, are
organizations composed of low-income tenants of these subsidized
17  housing units.  The associations exist for the primary purpose of
preserving affordable housing for low-income residents of the
18  Carmichael area in Sacramento County.  The California Coalition for
Rural Housing Project is a nonprofit organization whose mission is
19  to preserve and produce affordable housing, with a special focus
on persons residing in housing receiving assistance from HUD.  The
20  Coalition has filed an affidavit averring that among its members
are low-income people who are seeking, but presently do not reside
21  in, HUD subsidized housing.  See Decl. Rob Weiner, at ¶¶ 2, 5, 7,
8.

22    [2]  The prospective buyer, U.S. Housing Partners, ("the
Buyer"), has intervened.
23

24    [3]  Respectively, the housing Properties are the Kenneth Arms
Apartments, a 97-unit rental housing development located in
25  Carmichael, California which is owned by defendant, Kenneth Arms
Limited Partnership; the Rancho Arms Apartments, a 95-unit rental
26  housing development located in Rancho Cordova, California which is
owned by defendant, Rancho Arms Limited Partnership; the San Juan

                                2

1  entered into agreements with the Government through the so-called
2  Section 236 program.  Under the Section 236 program, the Owners
3  received the benefits of HUD mortgage insurance, and the federal
4  agency's commitment to pay all but one percent of the interest on
5  their mortgages.[4]  In exchange for these subsidies, the Owners
6  could not receive more than below market rent for any rented unit.[5]
7  The Section 236 mortgages of the four Properties were set to mature
8  at varying dates between 2013 and 2015.

9      After obtaining their government mortgages, the Owners and HUD
10  executed successive Housing Assistance Payment contracts wherein
11  HUD agreed to provide "project-based" Section 8 assistance payments
12  to the Owners to cover the difference between the rent contributed
13  by the tenant and the maximum approved contract rent for their
14  units.  Specifically, Section 8 tenants pay thirty (30) percent of
15  their adjusted gross income as their share of the rent and HUD pays
16  the balance.  The Section 8 contracts executed between HUD and the
17  defendants subsidize between 40% to 70% of the rental units on the
18  Properties.

19      Between October 23, 2000, and November 30, 2000, the Owners
20  sent notices to the residents of the Properties advising them that

21

22  Apartments, a 70-unit rental housing development located in Fair
23  Oaks, California which is owned by defendant, San Juan Limited
    Partnership; and the Manzanita Arms Limited Partnership, an 89-unit
24  rental housing development located in Carmichael, California which
    is owned by defendant, Manzanita Arms Limited Partnership.

25      [4]   12 U.S.C. § 1715z-1(c).

26      [5]   12 U.S.C. § 1715z-1(f).

3

1 they intended to prepay their HUD mortgages and not renew their
2 Section 8 contracts.[6] These notices were sent in connection with
3 the Owners' intention to sell the Properties to U.S. Housing
4 Partners.  Plaintiffs allege that the Buyer had entered into
5 certain "use agreements" with HUD concerning the future of the
6 subsidized units.

7    California has adopted statutes regulating the termination of
8 subsidized housing. Cal. Gov't Code § 65863.10-.11. Plaintiffs
9 allege that Owners violated California's notice requirements in a
10 variety of ways.[7]  They also contend that because HUD's Housing
11 Notice 99-36 required the Owners to comply with any State or local
12 notice requirements, the notices, in effect, failed to comply with
13 federal law.  As a result, plaintiffs submit that the Owners'
14 failure to provide their tenants with lawful notice of their intent
15 to opt-out of Section 8 housing has caused great confusion and
16 interfered with plaintiffs' efforts to obtain rent subsidies.  In
17 addition, plaintiffs claim that by virtue of the Owners failure to
18 comply with California's right of first refusal provisions, the

19

20    [6]  The Owners tender evidence that the tenants received
written notices concerning prepayment of their HUD mortgages and
21 the non-renewal of Section 8 assistance on July 26, 2000, August
18, 2000, October 30, 2000, and November 30, 2000.
22

23    [7]  Plaintiffs allege that the notices were deficient in that
they failed to send written notice to the California Department of
Housing and Community Development of their intent not to renew
24 their Section 8 contracts, did not include the current rent and
anticipated future rents, were not on the Owners' or duly
25 authorized representatives' letterhead, were only in English, and
failed to include the name and telephone number of the county and
26 a legal services organization.

4

1 time when fewer than twelve months remain in the Section 8
2 contract term, the statute authorizes HUD to provide a short-
3 term renewal of the expiring contract "for a period of time
4 sufficient to give tenants 1 year of advance notice" under terms
5 and conditions that HUD requires.   42 U.S.C. § 1437(c)(8)(B).
6 The statute, however, also requires that the notice comply with
7 "any additional requirements established by the Secretary."
8 24 U.S.C. § 1437f(c)(8)(C).

9    On December 29, 1999, HUD issued Housing Notice 99-36 which
10 addressed election to opt-out of a project-based Section 8
11 program.[10]   Section XVI-G of that Notice recites that "besides
12 meeting the Federal notification requirement, project Owners
13 must also comply with any State or local notification
14 requirements.  Owners should check with their appropriate local
15 authorities to find out about such requirements."   The question

16

17         the availability of appropriations for any year.

18         (B) In the event the owner does not provide the
         notice required, the owner may not evict the tenants or
19         increase the tenants rent payment until such time as the
         owner has provided the notice and 1 year has elapsed.
20         The  Secretary  may  allow  the  owner  to  renew  the
         terminating contract for a period of time sufficient to
21         give tenants 1 year of advance notice under such terms
         and conditions as the Secretary may require.

22         (C) Any notice under this paragraph shall also
         comply with any additional requirements established by
23         the Secretary.

24         [10]  Housing Notice 99-36 expired on December 12, 2000, and was
replaced with the Section 8 Policy Renewal Guide issued on January
25 19, 2001.  At oral argument, the parties agreed that the new Guide
does not alter the Owners' obligation to comply with State law
26 notice requirements.

7

1   need only provide a letter of intent to the tenants, HUD, and
2   the chief executive officer for the state or local government
3   for the jurisdiction in which the their Property is located "no
4   less that 150 days, but no more than 270 days, before such
5   prepayment." FY 1999 Appropriations Act, § 219(b)(3). There is
6   no dispute that the Owners have satisfied this requirement.
7   Rather, plaintiffs maintain that Housing Notice 99-36 requires
8   HUD to ensure that the Owners comply with state law. I cannot
9   agree.

10      I begin by noting that Congress has specified the
11  conditions under which a Section 8 Owner may "opt-out." All
12  that is required is that the Owner (1) provide written notice to
13  the tenants and HUD at least one year before the proposed
14  termination of the Section 8 contract and (2) a statement that
15  HUD will provide tenant-based rental assistance. 42 U.S.C.
16  § 1437f(c)(8)(A).[9] In cases where the Owner gives notice at a

17

18      [9] 42 U.S.C. § 1437(f)(c)(8) provides:

19          (A) Not less than one year before termination of
        any contract under which assistance payments are
20      received under this section, other than a contract for
        tenant-based assistance under this section, an owner
21      shall provide written notice to the Secretary and the
        tenants involved of the proposed termination. The
22      notice shall also include that, if the Congress makes
        funds available, the owner and the Secretary may agree
23      to a renewal of the contract, thus avoiding termination,
        and that in the event of termination the Department of
24      Housing and Urban Development will provide tenant-based
        rental assistance to all eligible residents, enabling
25      them to choose the place they wish to rent, which is
        likely to include the dwelling unit in which they
26      currently reside. Any contract for a period of up to 1
        year or any number or years, with payments subject to

6

1 tendered is whether the acknowledgment of the Owners' obligation
2 to obey state law is an additional requirement within the
3 meaning of 24 U.S.C. § 1437f(c)(8)(C).  I conclude it is not.

4 By its terms, the Notice does not place any affirmative
5 legal obligation on HUD to ensure that all Owners with Section 8
6 housing comply with state law when opting out.  Rather, the
7 Notice appears to be no more than a reminder to property owners
8 that they must comply with state notification requirements, a
9 particularly appropriate admonition since compliance with
10 federal notice procedures does not necessarily satisfy the
11 requisites of state law.  Put another way, given that, ab
12 initio, HUD has no obligation to enforce state and local notice
13 requirements, the advice to the Owners would not appear to
14 represent a self-imposed obligation.  Indeed, given that the
15 states are perfectly capable of enforcing their own laws, no
16 immediate reason suggests itself as to why HUD would obligate
17 itself to ascertain the various notice requirements of the fifty
18 states and seek to enforce them.  Accordingly, I conclude that
19 plaintiffs' cause of action against HUD premised on its
20 violation of its own regulations must fail, and thus HUD's
21 motion to dismiss this claim must be granted.

22 Plaintiffs next contend that HUD approved the Owners'
23 request to sell their Properties without ensuring that the
24 projects will continue to operate in a manner that will provide
25 rental housing on terms at least as advantageous to existing and
26 future tenants as the terms required by the 236 program.  See 12

8

1  U.S.C. § 1701z-11(k)(2).[11]  As I explain below, 12 U.S.C.
2  § 1701z-11(k)(2) is simply inapplicable to the facts of this
3  case.

4      The statute plaintiffs rely on sets conditions with respect
5  to HUD's approval of the sale of any subsidized project.  In the
6  matter at bar, however, the Owners intend to prepay their
7  mortgages.  The Housing Opportunity Program Extension Act of
8  1996 ("HOPE"),  Pub.L. No. 104-120, § 2, 110 Stat. 834,
9  permitted mortgage prepayment without HUD's approval.[12]
10 Accordingly, upon prepayment, the Properties will no longer be
11 subject to insured and subsidized mortgages, and it follows that
12 when the sales occur, HUD will have no power to either authorize
13 or prevent the sale of the Properties at issue.  Because the
14 Owner's mortgages will be prepaid, 12 U.S.C. § 1701z-11(k)(2)
15 does not apply.  Again, this claim is insufficient to premise a

16
17     [11]  12 U.S.C. § 1701z-11(k)(2) provides:

18     The Secretary may not approve the sale of any subsidized
       project-

19         (A) that is the subject to a mortgage held by the
       Secretary, or
20         (B) if the sale transaction involves the provision
       of any additional subsidy funds by the Secretary or a
21     recasting of the mortgage, unless such sale is made as
       part of a transaction that will ensure that the project
22     will continue to operate, at least until the maturity
       date of the loan or mortgage, in a manner that will
23     provide rental housing on terms at least as advantageous
       to existing and future tenants as the terms required by
24     the program under which the loan or mortgage was made or
       insured prior to the sale of the project.
25
26     [12]  Thus, termination of affordability restrictions imposed
   upon the project was also permitted.

9

1  cause of action against the Agency.

2      Plaintiffs also contend that HUD and the Owners have not
3  assured the existence of low-income housing because the Owners
4  may raise rents to a level that HUD deems "unreasonable," and
5  thus the tenants could be forced to seek new housing.  HUD,
6  however, does not have the authority to regulate rents of
7  Properties that the Agency does not own or which are not
8  subsidized by it.  Plaintiffs' argument that this result is
9  unjust or bad policy is directed to the wrong forum. Congress
10  has decided to allow the prepayment of mortgages and Section 8
11  opt-outs without HUD approval, and has sought to deal with the
12  resulting loss of affordable housing by the creation of enhanced
13  vouchers.  See 42 U.S.C. § 1437f(o).  Even if I concurred with
14  plaintiffs' view that moving away from unit-based Section 8
15  housing is ill advised, particularly given the limited low-
16  income housing in the Sacramento area, the court is bound by the
17  contrary judgment of Congress.  What plaintiffs decry as the
18  unfortunate effects of Congress' determination to move away from
19  unit-based programs is not a basis for a cause of action against
20  HUD.

21      Plaintiffs also argue that HUD failed to consider whether
22  the Properties were eligible for the Mark-Up-to-Market Program
23  under which HUD can increase Section 8 rent levels to comparable
24  market rents.  Plaintiffs submit that HUD violated its
25  affirmative duties under the Fair Housing Act by approving and
26  facilitating the sale of the Properties without first

10

1  Owners have endangered the continued use of the Properties for
2  those classes of tenants intended to be protected under the state
3  statute. See Cal. Gov't Code § 65863.11(b)-(c).

4      Plaintiffs also allege that HUD violated federal law by
5  approving the sale of the Properties and facilitating it by signing
6  use agreements with the prospective Buyer.  Plaintiffs allege that
7  these use agreements permit rents to be set at or above market
8  rate, and thus HUD has failed to ensure that the Properties will
9  continue to operate on terms that are at least as advantageous as
10 those under Section 236.   Finally, plaintiffs submit that HUD
11 approved the sale of the Owners' Properties without first
12 considering the statutory goals of the National Housing Act and the
13 racial  and  socio-economic  impact  of  the  withdrawal  of  the
14 developments from the federal housing program.

15                                **II.**

16                **MERITS OF PLAINTIFFS' CLAIMS**

17 **A.    AGAINST HUD[8]**

18     Plaintiffs raise a number of reasons why they will likely
19 succeed on the merits in their suit against HUD.  Below, I
20 explain why the court concludes that they have failed to state a
21 claim against the federal defendant.

22     Plaintiffs concede that there is no federal statute or HUD
23 regulation which inhibits or restricts the Owners right to
24 prepay their mortgages.  Under the federal program, the Owners

25  _____

26     [8]  In this section, I consider HUD's motion to dismiss or, in
    the alternative, for summary judgment.

                                  5

1   considering the racial and socioeconomic effects of its actions.
2   Both these arguments, however, presuppose that HUD's approval
3   was required prior to prepayment of the Owners' mortgages.

4       Of course, HUD must act consistent with the purposes of its
5   enabling statutes.  That obligation becomes more pressing when
6   there is need to inform the agencies' discretion and authority.
7   See Russell v. Landrieu, 621 F.2d 1037, 1041-42 (9th Cir. 1980)
8   (objectives and priorities of the National Housing Act, must be
9   considered when HUD is disposing of its own property).  In the
10  matter at bar, however, HUD has no discretion to refuse the
11  prepayment, and once the Owners prepay their mortgages, HUD no
12  longer has any say concerning the use of the Properties.  In
13  sum, HUD's legal obligations are limited to ensuring that Owners
14  who are opting out of Section 8 housing comply with federal
15  notice requirements.  See 42 § 14347f(C)(8)(A).  I conclude
16  that plaintiffs' arguments are misplaced, and its contentions in
17  this regard cannot support a cause of action against HUD.

18      Plaintiffs then assert that HUD's execution of the use
19  agreements with the Owners was an abuse of discretion.[13]  Diane
20  Brambila, HUD's Supervisory Project Manager of the Office of
21  Multifamily Project Management in Sacramento, was contacted by
22  the Buyer, concerning execution of use agreements.  On September
23  28, 2000, the agreements were formally executed.  Because no

24

25  [13]  A use agreement in this context refers to a document in
    which an owner or prospective owner of a multifamily housing
26  development, inter alia, agrees to limit the amount that the owner
    will charge for rents.

11

1  federal requirement for such agreements exists, it is clear that
2  the Buyer was seeking to comply with State law. Cal. Gov't Code
3  § 65863.11(d)(2). Why HUD entered into these agreements is
4  uncertain.

5      HUD argues that I need not reach plaintiffs' claim that the
6  execution of the use agreements was an abuse of discretion,
7  because the agreements are void and unenforceable since Ms.
8  Brambila was not authorized to execute them. It appears to the
9  court, however, that I need not resolve the issue of the
10  validity of the use agreements as between the signatories.
11  Whether the contracts are enforceable inter se, it is irrelevant
12  to the issue of whether HUD's execution of the agreements
13  provide a cognizable claim by the plaintiffs of a violation of
14  federal law.

15      Once again, the court notes that under the applicable
16  federal law, beyond insuring that the Owners' prepayment of the
17  Section 8 contract termination complies with federal notice
18  requirements, HUD could not prevent prepayment of the Owner's
19  mortgages. See 42 U.S.C. § 1437f(C)(8)(A). Put directly, given
20  HUD's limited role, execution of the use agreements could not
21  violate its duties under the National Housing Act as they exist
22  vis-a-vis the plaintiffs, i.e., HUD's acknowledgment that state
23  law was satisfied binds neither the plaintiffs, nor this court.
24  Accordingly, whatever psychological comfort the Buyer gained,
25  the legal effect is, from the plaintiffs' perspective, nil.
26  ////

12

1  I conclude that this claim, like all its predecessors, lacks
2  legal merit and must be dismissed.

3      Because the court's conclusions concerning plaintiffs'
4  claims against HUD are essentially legal in nature, amendment of
5  the complaint would be futile.  Accordingly, the dismissal will
6  be with prejudice.

7  **B.   AGAINST THE OWNERS[14]**

8      **i.   Federal Claims**

9      Plaintiffs have alleged two federal claims against the
10  Owners.  Below I explain why each claim fails to state a cause
11  of action.

12      First, plaintiffs allege that the Owners violated 42 U.S.C.
13  § 1437f, premised on the Owners' asserted non-compliance with
14  California's notice requirements.  Above, the court determined
15  that Housing Notice 99-36 imposed no federal duty to comply with
16  California law.  Accordingly, plaintiffs fail to state a claim
17  that the Owners' have violated federal notice requirements.

18      Plaintiffs also allege that the defendants have violated 12
19  U.S.C. § 1715z-1b, because the Owners interfered with the
20  tenants' efforts to obtain rent subsidies.  Again, this claim is
21  premised not on a violation of federal notice requirements, but
22  on the State's statutory notice provisions.  Put directly, this
23  claim is a state law issue which cannot be transmuted into a

24

25  [14]   Here, I consider whether the plaintiffs demonstrate a
   basis for obtaining injunctive relief, i.e., whether they have
26  shown a likely success on the merits, or at least fair grounds to
   litigate.

13

1   federal claim.

2       In sum, the court finds that plaintiffs' federal claims

3   against the Owners are not viable.  Accordingly, they are

4   dismissed on the court's own motion.  Again, because the

5   determination herein is legal in nature, the dismissal is with

6   prejudice.  The court next turns to plaintiffs' state law based

7   claims.[15]

8       **ii.  Retroactivity**

9       The California statutes with respect to the termination of

10  governmental subsidy contracts and the prepayment of HUD

11  mortgages were amended as of January 1, 2001.  See Cal. Gov't

12  Code §§ 65863.10-11.  Accordingly, the court must decide

13  whether to apply the present state notice requirements

14  _____

15     [15]  Upon dismissal of all of plaintiffs' federal causes of
    action, the court will lose the head of federal jurisdiction.

16  I have noted elsewhere that binding Ninth Circuit law precludes
    pure pendant party jurisdiction.  See Elsaas v. County of Placer,

17  35 F.Supp.2d 757 (E.D. Cal. 1999).  Nonetheless, as plaintiffs
    note, the Ninth Circuit has authorized resolution of cases where

18  the head of federal jurisdiction is lost.  Munger v. City of
    Glasgow Police Department, 227 F.3d 1082, 1089 n.4 (9th Cir. 2000),

19  Acri v. Varian Associates, 114 F.3d 999, 1000 (9th Cir. 1997).
    Reconciling these cases with Ayala v. United States, 550 F.2d 1196

20  (9th Cir. 1977), is a task for those with authority to do so.
    Suffice it to say that since I am convinced that Ayala was wrongly

21  decided, and, more to the point, I am as bound by the subsequent
    cases as I am by Ayala, I conclude that I may dispose of the

22  remaining issues.  In deciding to do so, the court notes that it
    has twice inquired of counsel for plaintiffs and the Buyers and

23  Sellers as to whether it should resolve the state law claims after
    losing the head of federal jurisdiction.  The court was urged by

24  all parties to proceed in light of the need for quick resolution
    of the issues, and the economic consequences of dismissing the

25  suit.  Although the case raises difficult state law issues, the
    Pullman doctrine is one of prudence rather than jurisdiction, and

26  under the circumstances, the court will accede to the request of
    the parties and address the state court claims.

1 retroactively.  Below, I examine this issue.[16]

2     The general rule under California law is that absent some
3 clear indication to the contrary, any change in the law is
4 presumed to have prospective application only.  See Evangelatos
5 v. Superior Court, 44 Cal.3d 1188, 1207 (1988).  The California
6 Supreme Court has held that that "[t] he first rule of
7 construction is that legislation must be considered as addressed
8 to the future, not to the past . . . . The rule has been
9 expressed in varying degrees of strength but always of one
10 import, that a retrospective application will not be given to a
11 statute which interferes with antecedent rights . . . unless
12 such be the 'unequivocal and inflexible import of the terms, and
13 the manifest intention of the legislature.'" Id. (citing United
14 States v. Security Industrial Bank, 459 U.S. 70, 79 (1982)).
15 Accordingly, a strong presumption exists against retroactive
16 application of new statutes and administrative rules.  See
17 Rosaco v. Commission on Judicial Performance, 82 Cal.App.4th
18 315, 319 (2000).

19     To have a genuinely retroactive effect, the application of
20 a statute must affect the "rights, obligations or conditions
21 that existed before the time of the statute's enactment, giving
22 them an effect different from that which they had under the

23

24     [16]   Because the issue deals with the construction of a state
25 statute, I resolve it as a matter of state law.  See, e.g.,
California Prolife Council v. Scully, 164 F.3d 1189, 1191 (9th Cir.
26 1998)(severability of state statute decided by federal court under
state law standards).

1  previously existing law."   See Evangelatos, 44 Cal.3d at 1208.
2  Put another way, retroactive application of recently enacted law
3  applies the "new law of today to the conduct of yesterday."  In
4  re Joshua M., 66 Cal.App.4th 458, 469, fn. 5 (1998).  Under
5  California law, the decisive question with respect to the
6  retroactive application of a state statute is whether the change
7  in the law creates "a substantive change in the legal
8  circumstances in which an individual has already placed himself
9  in direct and reasonable reliance on the previously existing
10 state of the law." Rosaco, 82 Cal.App.4th at 322.

11       In the matter at bar, between July 26, 2000, and November
12 30, 2000, the Owners provided notices to their tenants of their
13 intent to sell and opt-out of Section 8 housing.  The amendments
14 to Cal. Gov't Code, § 65863.10-.11, which governed the Owners
15 notice obligations, modified the definition of a "qualified
16 purchaser," required Owners to provide one year rather than nine
17 month termination notices, and altered what was to be contained
18 in such notices and to whom they should be sent. See Cal. Gov't
19 Code, § 65863.10-.11 (amended 2001).  Clearly these changes
20 alter the substantive rights and legal obligations of the
21 parties to this action.

22       Accordingly, the court will apply Cal. Govt. Code §
23 65863.10-.11 as it existed at the time the Owners issued the
24 notices of their intent to prepay their mortgages and opt-out of
25 providing Section 8 housing.
26 ////

1        **iii.   Preemption**

2            **a.   Express Preemption**

3        The Owners assert that the state's statutory requirements

4   of notice and right to first refusal are preempted by virtue of

5   12 U.S.C. § 4122.[17]  Plaintiffs and HUD contend, however, that

6   this statute does not govern the matter at bar.  Thus, before

7   analyzing the effect of the state statutes, I must determine the

8   merits of plaintiffs and HUD's argument.  I turn to that task.

9        Section 4122 of Title 12 is a provision of the Low Income

10  Housing Preservation and Resident Homeownership Act of 1990,

11  codified at 12 U.S.C. §§ 4101 et seq. ("LIHPRHA").  Under

12

13        [17]  12 U.S.C. § 4122 provides:

14        (a) In general

15        No  state  or  political  subdivision  of  a  State  may
          establish, continue in effect, or enforce any law or
16        regulation that -

17        (1) restricts or inhibits the prepayment of any mortgage
          described in Section 4119(1) of this title (or the
18        voluntary termination of any insurance contract pursuant
          to Section 1715(t) of this title) on eligible low income
19        housing . . .

20        (b) Effect

21        This  section  shall  not  prevent  the  establishment,
          continuing  in  effect  or  enforcement  of  any  law  or
22        regulation of any State or political subdivision of a
          State not  inconsistent  with  the  provisions  of  this
23        subchapter, such as any law or regulation relating to
          building standards, zoning limitations, health, safety,
24        or habitability standards for housing, rent control, or
          conversion  of  rental  housing  to  condominium  or
25        cooperative  ownership,  to  the  extent  such  law  or
          regulation is of general applicability to both housing
26        receiving Federal assistance and non assisted housing.

                                    17

1  LIHPRHA, a government subsidized mortgage could not be prepaid
2  without HUD's approval. 12 U.S.C. § 4101(a).  To effectuate
3  prepayment, an Owner was required to file with HUD a "notice of
4  intent" and thereafter a "plan of action."  12 U.S.C. § 4102(a).
5  Before approving the plan of action, LIHPRHA required HUD find
6  that implementation of the plan of action would not adversely
7  affect current tenants and that the supply of vacant, comparable
8  housing would be sufficient to ensure that prepayment would not
9  materially affect the availability of decent, safe, and sanitary
10 housing available to low-income persons in the housing market
11 served by the Owner's project.  12 U.S.C § 4108(a).  If the
12 Secretary could not make the necessary findings, LIHPRHA
13 required that the Secretary disapprove the plan to prepay and
14 that the Owner's notice of intent to prepay would not have any
15 legal effect.  12 U.S.C. § 4108(c).  Events soon overtook this
16 statutory scheme.

17      For whatever reason, Congress abandoned the scheme embodied
18 in LIHPRHA.  While not formally repealing the earlier statute,
19 the 1996 HOPE Act took an entirely different tack.  The later
20 statute permitted mortgage prepayment without HUD approval, and
21 thus termination of affordability restrictions imposed upon a
22 project, provided only that the Owners agree not to increase
23 project rents for a period of sixty (60) days after prepayment.
24 As a result of HOPE, Congress began to significantly reduce the
25 funding appropriated under LIHPRHA to pay for financial
26 incentive to Owners, and no funding at all has been appropriated

1  for incentives for new plans of action since 1998.  Indeed, HUD
2  no longer has the authority to accept new preservation
3  applications or to enter into new plans of action, and has
4  continued to implement and enforce the provisions of LIHPRHA
5  only as to those Owners who were in the program prior to the
6  passage of HOPE in 1996.

7      In the matter at bar, the Owners were never involved in the
8  LIHPRHA Preservation Program, and never operated under the
9  LIHPRHA plan of action.  Rather, the prepayment scheme followed
10  by the Owners is that embodied in HOPE, permitting mortgage
11  prepayment without HUD approval, rather than LIHPRHA with its
12  restrictions.  Given the above, the court concludes that the
13  preemption provision of LIHPRHA, 12 U.S.C. § 4122, does not
14  govern and thus does not preempt the California notice and right
15  of first refusal statutes.

16          **b. Implied Preemption**

17      The Owners also assert that plaintiffs' state law claims
18  are barred under the doctrine of conflict preemption.  The
19  Owners submit that California's notice requirements and
20  provision for a right of first refusal permanently lock Owners
21  of HUD projects into project-based assistance.  Below, I explain
22  why the Owners' argument, as a facial matter, is not persuasive.
23  I begin with an overview of the doctrine.

24      Conflict preemption bars the application of state law which
25  directly contravenes federal law.  Freightliners Corp. v.
26  Myrick, 514 U.S. 280, 287 (1995); Motus v. Pfizer, Inc., 127

19

1  F.Supp.2d 1085, 1091 (C.D. Cal. 2000).  Thus, preemption would
2  be found here if the Owners demonstrate that they cannot
3  simultaneously conform to state and federal law.  Florida Lime &
4  Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963).
5  Under such circumstances, the state law must relent.  California
6  v. ARC America Corp., 490 U.S. 93, 100, 109 (1989).  State law
7  is also preempted when it "stands as an obstacle to the
8  accomplishment and execution of the full purposes and objectives
9  of Congress."  International Paper Co. v. Ouellette, 479 U.S.
10 481, 492 (1987).  Accordingly, to the extent a state law
11 interferes with the manner in which Congress intended the
12 federal law to operate, the state law is preempted--even where
13 the state and federal laws share common goals.  Gade v.
14 National Solid Wastes Management Ass'n., 505 U.S. 88, 103
15 (1992).

16     As I have explained, there is no federal law which
17 restricts or inhibits the prepayment of HUD insured mortgage or
18 requires HUD approval.  Passivity, however, is not the
19 equivalent of action, and there seems to be no reason to suggest
20 that California's notice requirements which are designed to
21 insure the availability of low cost housing, is inconsistent
22 with the overall purposes of the National Housing Act.  No doubt
23 these state statutes provide for procedural requirements not
24 required by federal law.  It is clear, however, that the states
25 have the right to impose greater procedural restrictions than
26 those imposed by federal law.  See California Federal Savings

1 | and Loan Assoc. v. Guerra, 479 U.S. 272, 285 (1987).

2 |     The Owners maintain that California's requirements inhibit

3 | the Congressional determination to move from unit-based to

4 | tenant-based programs.  That argument is not well taken.

5 | California's restrictions seek to protect the State's most

6 | vulnerable population, clearly a proper state interest.  It does

7 | so, however, not by preventing a shift from unit-based to

8 | tenant-based programs, but by attempting to insure that any

9 | transfer preserves affordable housing, however achieved.  Thus,

10 | the Owners contention that these California statutes on their

11 | face lock affordable housing projects into their current status

12 | is without merit.[18]

13 |     Having concluded that the State laws at issue do not

14 | facially conflict with federal law, I turn to the question of

15 | whether the Owners have complied with the State's provisions.

16 |     **iv.   State Law**

17 |     The Owners contend that they substantially complied with

18 | the State's tenant notice requirements and were not subject to

19 | the right of first refusal statute.  Below, I examine each

20 |

21 |     [18]  In considering the merits, I explain that the parties have

22 | failed to provided an evidentiary basis for evaluation of the effect of the Buyer's method of setting the maximum rent.

23 | Nonetheless, as I explain there, it is possible that the California statute as it actually effects the Buyer might conflict with

24 | federal law.  Because Buyer bears the burden of proof as to conflict preemption, Jimeno v. Mobil Oil Corp., 66 F.3d 1514, 1526

25 | n. 6 (9th Cir. 1995), however, the failure to provide such an evidentiary basis for the claim of conflict preemption precludes

26 | a finding that the doctrine bars either plaintiffs' claims against the Owners, or their ability to obtain a preliminary injunction.

1 | argument in turn.

2 | **a.   Notice Requirements**

3 | Under the applicable California law,[19] an Owner of an
4 | assisted housing development who seeks to terminate a project-
5 | based Section 8 contract must provide at least nine months
6 | notice of the proposed change to each effected tenant household
7 | residing in the assisted housing development.[20]   Cal. Gov't.
8 | Code § 65863.10(b) mandates that the notices contain specific
9 | information for the purpose of explaining to the tenants the
10 | process and ramifications of the Owners' decision to opt-out of
11 | Section 8 housing.[21]   In addition, California law provides that

13 | [19]  As stated above, the court will apply California law as it
     | existed at the time the Owners issued notices of their intent to
14 | opt-out of Section 8 housing and pre-pay their HUD mortgage.

15 | [20]  Cal Gov't Code § 65863.10 provides that:

16 | (b) At least nine months prior to the anticipated date
     | of termination of a subsidy contract or prepayment on an
17 | assisted housing development, the owner proposing the
     | termination or prepayment of governmental assistance
18 | shall provide a notice of the proposed change to each
     | affected tenant household residing in the assisted
19 | housing development at the time the notice is provided.

20 | The amended Cal. Gov't Code § 65863.10(b)(1) requires twelve months
     | notice.

21 | [21]  Cal. Gov't. Code § 68863.10 (b) provides:

22 | (1)   The anticipated date of the termination or
     | prepayment of the federal program, and the identity of
23 | the federal program . . .

24 | (2) The current rent and anticipated new rent for the
     | unit on the date of the prepayment or termination of the
25 | federal program.

26 | (3) A statement that a copy of the notice will be sent

22

1 | an Owner's notice to tenants "shall" simultaneously be filed
2 | with a number of public entities, including the chairperson of
3 | the Board of Supervisors of the County, and the Department of
4 | Housing and Community Development.  Cal. Gov't Code
5 | § 65863.10(c)(1).  Finally, these entities "shall" send
6 | additional notices, containing supplemental information
7 | regarding the number of tenants affected, the number of units
8 | that are government assisted and the types of assistance, the
9 | number of the units that are not government assisted, the number
10 | of bedrooms in each unit that is government assisted, and the
11 | ages and income of the affected tenants.  Id. at §
12 | 65863.10(c)(2).

13 | ////

14

15 |    to the city or county, or city and county, where the
   |    assisted development is located, to the appropriate
16 |    local public housing authority, if any, and to the
   |    Department of Housing and Community Redevelopment.

17 |    (4) A statement of the possibility that the housing may
   |    remain in the federal program after the proposed date of
18 |    subsidy termination or prepayment if the owner elects to
   |    do so . . .
19

20 |    (5) A statement of the owners' intention to participate
   |    in any current replacement federal subsidy program made
   |    available to affected tenants.
21

22 |    (6) The name and telephone number of the city, county,
   |    or city and county, the appropriate local public housing
23 |    authority, if any, the Department of Housing and
   |    Community Development, and a legal services
24 |    organization, that can be contacted to request
   |    additional written information about an owner's
25 |    responsibilities and the rights and options of an
   |    affected tenant.

26 | Id. § 65863.10(b)(1)-(6).

23

1    The Owners do not dispute that they have not strictly
2  complied with each of California's statutory notice
3  requirements.  They contend, however, that they have complied
4  with State law in all material respects.  This contention is
5  without merit.

6        Under California law, substantial compliance with a statute
7  is sufficient.  Greven v. Superior Court, 71 Cal.2d 287 (1969).
8  Thus, when there is actual compliance with all matters of
9  substance, mere technical imperfections of form or variations,
10  such "as obvious typographical errors," do not amount to
11  non-compliance.  Stasher v. Harger-Halderman, 58 Cal.2d 23, 29
12  (1962).  Substantial performance, however, requires "actual
13  compliance with every reasonable objective of a statute." Id.
14  For that reason, where a statute requires "detailed" notice, a
15  notice that contains only the "major ideas or concepts" is not
16  sufficient.  Smith v. Board of Supervisors of the City and
17  County of San Francisco, 216 Cal.App.3d 862, 874 (1989).

18        By their terms, Cal. Gov't Code §§ 65863.10-.11 are
19  "notice statutes" which explicitly require the communication of
20  detailed information to specified persons and entities.  It
21  follows that the Owners' deficient notices are more than mere
22  technical imperfections.  Rather, strict compliance with the
23  State's notice provisions goes to the heart of the statutes
24  themselves.

25        From all the above, the court concludes that the
26  plaintiffs have established a probability of success against the

1  Owners, as to their violations of California's opt-out and
2  prepayment notice requirements.

3  **b.   Right of First Refusal**

4      California has provided that an owner may not sell or
5  otherwise dispose of his development in a manner which would
6  result in either discontinuance of its status as an assisted
7  housing development, or the termination of any low-income use
8  restrictions which apply to the development, unless the owner
9  provides an opportunity to purchase the developments to
10 specified public and private entities.  Cal. Gov't Code
11 § 65863.11(b)-(c).[22]  If, however, an owner already has a bona
12 fide offer to purchase from a "qualified entity" at the time the
13 owner decides to sell the property, the owner is not required to
14 comply with the notice requirements.  Cal Gov't Code
15 § 65863.11(f).[23]

16

17 [22]  Specifically, under the applicable statutes, an Owner is
   required to give notice of his or her bona fide intention to sell
18 or otherwise dispose of the property to the tenant association of
   the development; local nonprofit organizations and public
   agencies; regional or national nonprofit organizations and
19 regional or national public agencies, and profit motivated
   organizations and individuals at least nine months prior to the
20 anticipated date of termination of the federal subsidy.  Cal. Gov't
   Code § 65863.11(b)-(c).   The bona fide notice is required to
21 include the sales price, the terms of assumable financing, the
   terms of the subsidy contract, and any proposed improvements to the
22 property to be made by the owner in connection with the sale, and
   finally, a  statement that each of notified entities has the right
23 to purchase the development in the order and according to the
   priorities established in Cal. Gov't Code § 65863.11(g).
24

25 [23]  Cal Gov't Code § 65863.11(f) provides in part:

26      If the owner already has a bonafide offer to purchase
       from a qualified entity, at the time the owner decides

25

1     The Owners assert that the right of first refusal does not

2 apply because they each had received bonafide offers to purchase

3 from qualified entities.  Plaintiffs do not dispute that the

4 Owners received "bonafide offers to purchase."  Rather,

5 plaintiffs assert that U.S. Housing Partners is not a "qualified

6 entity."  See Cal. Gov't Code § 65863.11(d)(1)-(2).[24]  In support

7 of that contention, plaintiffs maintain that the use agreements

8 fail to maintain the affordability of the four developments, as

9 required by state law.  I turn to the language of the use

10 agreements and evidence submitted to determine whether

11

12       to sell, or otherwise dispose of the development, the
owner shall not be required to comply with the
13       provisions of this subdivision.

14       [24] Cal Gov't Code § 65863.11(d) provides that the requisites
of a qualified purchaser are that the purchaser:
15

16       (1) Be capable of managing the housing and related
facilities for its remaining useful life, either by
17       itself or through a management agent.

18       (2) Agree to obligate itself and any successors in
interest to maintain the affordability of the assisted
19       housing development for persons and families of low or
moderate and very low income for either a 30-year period
20       from the date that the purchaser took legal possession
of the housing or the remaining term of the existing
21       federal government assistance specified in subdivision
(a) of Section 65863.10, whichever is greater.  The
22       development shall be continuously occupied in the
approximate percentages that those persons and families
23       occupied that development on the date the owner gave
notice of intent or the approximate percentages
24       specified in existing use restrictions, whichever is
higher.  This obligation shall be recorded prior to the
25       close of escrow in the office of the county recorder of
the county in which the development is located and shall
26       contain a legal description of the property, indexed to
the name of the owner or grantor.

1  plaintiffs' argument has merit.

2      Buyer, through the execution of the use agreements, has

3  agreed to limit new tenants to those with incomes that are no

4  greater than 80% of the adjusted area median income ("AMI") for

5  the area where the property is located, as determined by HUD.[25]

6  See Decl. Steven Klein, at 3 ¶ 12, Exhs. 5-8.[26]  For any future

7  qualifying tenant, Buyer agrees to charge no more than 30% of

8  that 80% figure as rent, and argues that actual rents will also

9  be limited by area market forces as to what a qualified low-

10 income tenant can afford to pay. See Decl. Steven Klein, at 3

11 ¶ 12, Exhs. 5-8.  With respect to the present tenants,  HUD has

12 indicated that the plaintiffs herein are among the statutorily

13 defined classes of eligible tenants for whom enhanced voucher

14 assistance is available.  See 42 U.S.C. § 1437f(t)(2); HUD's

15 Oppo. at 7:14-16, 8:1-4; Decl. Steven Klein, at 3 ¶¶ 15-19.[27]

16 The Buyers have averred that income qualified tenants have the

17 right to retain their units, if they so choose, see Decl. Steven

18

19    [25]  This formula was adopted by Buyer because the Federal
20 Section 236 Regulatory Agreement permitted only those tenants who
   earn 80% or less of median income to reside in low-income projects.
21 See Decl. Steven Klein, at 3 ¶ 12.

22    [26]  While not expressly stated in the use agreements, Buyer
   declares that it will honor the existing security deposits for all
23 present assisted tenants of the Properties and honor federal
   housing vouchers for all existing tenants. See Decl. Steven Klein,
24 at 2 ¶¶ 9-10.

25    [27]  A tenant is able to use an enhanced voucher only if the
   dwelling unit rent is reasonable in comparison with rents charged
   for comparable dwelling units in the private, unassisted market.
26 See 42 U.S.C. § 1437f(o)(10)(A); see also 24 C.F.R. § 982.507(b).

1  Klein, Exhs. 5-8, and so long as the current tenants remain
2  income qualified, their rents may not be increased beyond 30% of
3  80% of the AMI. Id.  Thus, Buyers claim that federal law coupled
4  with the use agreements protects the plaintiffs who reside in
5  these units. 42 U. S.C. § 1437(f)(t)(1)(B) & (D); Decl. Steven
6  Klein, at Exhs. 5-8.[28]

7       Plaintiffs argue that setting all rents for new tenants at
8  30% of 80% of the AMI effectively converts the Properties to
9  moderate income developments and thus violates California law.
10 The Buyers respond that they have met the requirements of a
11 "qualified purchaser" since the use agreements maintain
12 affordable rents for persons or families of "low or moderate
13 income and very low income."[29]  Before examining whether the use
14 agreements' rent calculations protect income qualified tenants,
15 I must first determine which groups of tenants must be protected
16 under California law.

17

18    [28]  With respect to the rents to be charged, the Sacramento
   Housing and Redevelopment Agency has approved the Buyer's proposed
19 rents of $550 per month for a one-bedroom apartment and $650 per
   month for a two-bedroom apartment.  Decl. Steven Klein, at Exh. 2-
20 4.

21    [29]  In the alternative, the Buyer asserts that Cal. Gov't Code
   § 65863.11(d)(2) has been amended and now ensures the affordability
22 of the assisted housing development for households of "very low,
   low,   or   moderate   income."   See   Cal.   Gov't   Code   §
23 65863.11(e)(2)(amended 2001). Thus, the Buyer argues that, from
   this amendment, it is clear that U.S. Housing Partners is in
24 compliance so long as it provides affordable housing restrictions
   for any of the three classes of low-income tenants.  As explained
25 above, because this statute has undergone substantial revisions
   which affect the rights and obligations of the parties to this
26 suit, I will not apply the amended statute retrospectively.
   Accordingly, this argument cannot prevail.

1    As noted above, to be a "qualified purchaser" under
2  California law, a purchaser of an assisted housing development
3  must agree to maintain the affordability of the units rented
4  "for persons and families of low or moderate income and very low
5  income" for a specified period.  Plaintiffs maintain that this
6  guarantees the protection of "very low income families."  The
7  court turns to construction of the statute, beginning and ending
8  with its plain words.

9    A straight forward reading of the language is that the
10 owner must protect on the one hand "low income persons" and then
11 using the disjunctive "or" "moderate" then using a conjunctive
12 "and" "low income families."  Put directly, the statute leaves
13 to the Buyer a choice as to maintaining units for a combination
14 of moderate and very low-income families on the one hand, or low
15 income families on the other.  Given this construction, I
16 examine whether the rent calculations set forth in the Buyer's
17 use agreements protect either protected class of tenants.

18    Cal. Gov't Code § 65863.11(a)(5)-(6) refers to Cal. Health
19 and Safety Code § 50093 as providing the definition of "low or
20 moderate income" and § 50052.5 as defining the meaning of "very
21 low income."  See Cal. Gov't Code § 65863.11 (a)(5)-(6).  Those
22 statutes define persons of low or moderate income as families
23 whose income does not exceed 120 percent of the AMI, subject to
24 HUD amendments, and persons of very low-income as families whose
25 income does not exceed 50 percent of the AMI.

26 ////

29

1    As noted, California law requires rent protection of the
2  specified classes and that the "development shall be
3  continuously occupied in the approximate percentages that those
4  persons and families occupied the development on the date Owner
5  gave notice of intent." Cal. Gov't Code § 65863.11(d)(2).
6  Moreover, the use agreements must so specify. Id. As I now
7  explain, it appears to the court that the plaintiffs have
8  demonstrated that there are fair grounds to litigate whether the
9  Buyer has complied with these requirements.

10    The apparent violation of California law derives from the
11  establishment of the 30% of 80% figure as a basis for
12  determining future rents.  The 80% figure seems clearly derived
13  from the admission standard.  In their opposition to the motion
14  for preliminary injunction, the Buyer explains that the "30%
15  figure was arrived at for the purpose of being consistent with
16  the Section 8 program," Buyer's Oppo. at 4:11-12, however, no
17  such consistency exists.

18    Section 8 limits rent chargeable to the tenant, to 30% of
19  the tenant's adjusted income, see 12 U.S.C. § 1715Z-1(f)(1),
20  while the Buyer's 30% is of the AMI.  This difference is
21  potentially enormous.  As Buyer concedes, it substituted the AMI
22  for adjusted gross income because it "cannot limit the rent
23  further without Section 8 assistance because the projects would
24  not be economically viable." Buyer's Oppo. at 4:12-15.  This
25  concession, at the very least, demonstrates an adverse effect on
26  the protected classes, thus satisfying plaintiffs' obligation to

1  show fair grounds to litigate a violation of provisions of the
2  State statutes at issue.[30]   The absence of evidence of the effect
3  on the protected classes' ability to rent pursuant to the
4  Buyer's mode of setting maximum rents, supports plaintiffs'
5  claim for preliminary injunctive relief.

6      Whatever else may be true, the mode of setting future rents
7  renders unclear whether Buyer has satisfied its obligation to
8  protect rents for the specified tenant groups.   In the absence
9  of such an demonstration, there is doubt that the Buyer is a
10 "qualified purchaser" within the meaning of Cal. Gov't Code §
11 65863.11(d)(2).   Nor has the Buyer in the use agreements, or
12 anywhere else as far as the court can determine, committed to
13 maintaining the approximate ratio of protected tenants, nor how
14 the 30% of 80% figure accomplishes that goal, if indeed it does.

15     A second reason, related to the first, also casts doubt on
16 the qualification of the Buyer.   Cal Gov't Code § 65863.11(d)(2)
17 not only requires that the Buyer protect the specified classes
18 and maintain the ratios noted, it requires that the Buyer commit
19 to doing so in a written recorded document.   The Buyer asserts
20 that the use agreements are those documents.   Yet the use
21 agreements do not, in terms, commit to satisfaction of the
22 statutory requirements, and, in so far as the Owners rely on the
23 30% of 80% figure, the absence of any apparent connection of

24

25     [30]   If Buyer had tendered evidence in support of its
26 conclusion it might at least suggest the possibility of conflict
   preemption.

31

1  that figure to the statutory requirement, strongly suggests that
2  the statute's specifications have not been satisfied.

3      Having concluded that the plaintiffs' have made a showing
4  on the merits, I turn to the question of the propriety of
5  equitable relief.

6                              **III.**

7  **PRELIMINARY INJUNCTION WITH RESPECT TO THE PENDENT CLAIMS**
8  **A.   APPLICABLE LAW**

9      Both plaintiffs and defendants agree that federal law
10 supplies the controlling standards.  Because the plaintiffs seek
11 injunctive relief for alleged violations of state law, I must
12 determine whether the Erie doctrine compels application of state
13 law standards.

14     It is established that the principles enunciated by the
15 Supreme Court in Erie R. Co. v. Tompkins, 304 U.S. 64 (1938),
16 regarding the application of state law in suits arising in
17 diversity apply with equal force where a federal court exercises
18 its pendent jurisdiction over state law claims.  United Mine
19 Workers of America v. Gibbs, 383 U.S. 715, 726  (1966).   Under
20 the Erie doctrine, federal courts are bound to apply state
21 substantive law and federal rules of procedure to state law
22 claims.   Hanna v. Plumer, 380 U.S. 460, 465 (1965).
23 Nonetheless, the High Court has cautioned that "choices between
24 state and federal law are to be made not by application of any
25 automatic litmus test, but rather by reference to the policies
26 underlying the Erie rule,"  id. at 467, and most particularly

1 the policy which insures "substantial uniformity of predictable
2 outcomes between cases tried in federal court and cases tried in
3 the courts of the state in which the federal court sits."
4 Guaranty Trust Co. of New York v. York, 326 U.S. 99, 109 (1945).

5      Given the above, the court concludes that federal law
6 provides the appropriate standard with respect to plaintiffs'
7 motion for preliminary injunctive relief for both their federal
8 and state pendent claims.  See Sullivan v. Vallejo City Unified
9 School Dist., 731 F. Supp. 947, 957 (E.D. Cal. 1990).
10 Nevertheless, state law may be used to inform the court's
11 exercise of its equitable powers to decide if the issuance of a
12 preliminary injunction is warranted.  Id. at 956.  When
13 determining if plaintiffs' claims are likely to succeed on the
14 merits, "a federal court must inquire into whether injunctive
15 relief would be available as a matter of state law."  Id.  If no
16 equitable relief is available under state law, "a federal
17 district court may not exercise the discretion it has under the
18 federal standard to grant an injunction."  Id.; see also Sims
19 Snowboards, Inc. v. Kelly, 863 F.2d 643, 646 (9th Cir. 1988)
20 ("[t]he general equitable powers of federal courts should not
21 enable a party suing in diversity to obtain an injunction if
22 state law clearly rejects the availability of that remedy.").

23      While it has not been suggested that state law precludes
24 injunctive relief, as I explain below, the state statutes inform
25 the court as to its duty in addressing the equities.
26 ////

1 **B.   FEDERAL STANDARDS FOR A PRELIMINARY INJUNCTION**

2       The purpose of the preliminary injunction is to preserve

3 the relative positions of the parties -- the status quo -- until

4 a full trial on the merits can be conducted.   See University of

5 Texas v. Camenisch, 451 U.S. 390, 395 (1981).   The limited

6 record usually available on such motions renders a final

7 decision on the merits inappropriate.   See Brown v. Chote, 411

8 U.S. 452, 456 (1973).

9       "The [Supreme] Court has repeatedly held that the basis for

10 injunctive relief in the federal courts has always been

11 irreparable injury and the inadequacy of legal remedies."

12 Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).   In the

13 Ninth Circuit, two interrelated tests exist for determining the

14 propriety of the issuance of a preliminary injunction.   The

15 moving party carries the burden of proof on each element of

16 either test.   Los Angeles Memorial Coliseum Comm'n. v. National

17 Football League, 634 F.2d 1197, 1203 (9th Cir. 1980).   Under the

18 first "traditional" test, the court may not issue a preliminary

19 injunction unless each of the following requirements is

20 satisfied:   (1) the moving party has demonstrated a likelihood

21 of success on the merits, (2) the moving party will suffer

22 irreparable injury and has no adequate remedy at law if

23 injunctive relief is not granted, (3) in balancing the equities,

24 the non-moving party will not be harmed more than the moving

25 party is helped by the injunction, and (4) granting the

26 injunction is in the public interest.   See Martin v.

1 | International Olympic Committee, 740 F.2d 670, 674-75 (9th Cir.
2 | 1984).

3 | Under the second "alternative" test, the court may not
4 | issue a preliminary injunction unless the moving party
5 | demonstrates either "probable success on the merits and
6 | irreparable injury . . . or . . . sufficiently serious questions
7 | going to the merits to make the case a fair ground for
8 | litigation and a balance of hardships tipping decidedly in favor
9 | of the party requesting relief." Topanga Press Inc. v. City of
10 | Los Angeles, 989 F.2d 1524, 1528 (9th Cir. 1993) (citations
11 | omitted). The Ninth Circuit has explained that the two parts of
12 | the alternative test are not separate and unrelated, but are
13 | "extremes of a single continuum." Benda v. Grand Lodge of
14 | International Association of Machinists, 584 F.2d 308, 315 (9th
15 | Cir. 1978), cert. dismissed, 441 U.S. 937 (1979). We are taught
16 | that the critical element within this alternative test is the
17 | relative hardship to the parties. See id. "[T]he required
18 | degree of irreparable harm increases as the probability of
19 | success decreases." United States v. Nutri-cology Inc., 983
20 | F.2d 394, 397 (9th Cir. 1992) (citations and internal quotation
21 | marks omitted). Even if the balance tips sharply in favor of
22 | the moving party, however, "it must be shown as an irreducible
23 | minimum that there is a fair chance of success on the merits."
24 | International Olympic Committee, 740 F.2d at 674-75. (citation
25 | omitted).
26 | ////

1  **C.    BALANCING THE EQUITIES**

2      Given the court's conclusion that the plaintiffs have

3  demonstrated not only fair grounds to litigate on the issue of

4  "qualified purchaser," but also a strong showing on the

5  statutory notice provisions, the next step would ordinarily be

6  to balance the equities.  That is because "a federal judge

7  sitting as chancellor is not mechanically obligated to grant an

8  injunction for every violation of law."  Amoco v. Village of

9  Gambell, 480 U.S. 531, 542 (1987).  Despite this general rule,

10  however, the courts have recognized a species of statutes which

11  either "in so many words, or by necessary and inescapable

12  inference restricts the court's jurisdiction in equity."  Save

13  The Yaak Committee v. Block, 840 F.2d 714, 722 (9th Cir.

14  1988)(quoting Gambell, 480 U.S. at 542.).  As I have previously

15  explained, to answer the question of whether the California

16  statutes at issue are of that variety the court "must look to

17  the 'underlying substantive policy' that [the legislature]

18  designed the statute to effect, rather than its statutory

19  procedure."  Wilderness Society v. Tyrrell, 701 F. Supp. 1473,

20  1477 (E.D. Cal. 1998)(quoting Gambell, 480 U.S. 544 and citing

21  Northern Cheyenne Tribe v. Hodel, 851 F.2d 1152, 1156 (9th Cir.

22  1998)).

23      It is beyond cavil that the purpose of the California

24  statutes are to preserve low cost housing.  To insure this

25  purpose, the statutes require a right of first refusal be

26  offered to parties that will in fact preserve particular

36

1 developments for that purpose, unless the Buyer is "qualified,"
2 which means in practical terms, a purchaser who agrees to
3 maintain the housing for the statutory purpose. To insure the
4 efficacy of the statutes and to implement its goal, the statutes
5 in their terms prohibit sale unless the notice and right of
6 first refusal provisions are complied with. See Cal. Gov't Code
7 § 65863.10-.11. Under these circumstances, it would appear that
8 the state legislature "in so many words," Save the Yaak, 840
9 F.2d at 722, has commanded a result, thus restricting the
10 court's discretion. Nor is that the only evidence concerning
11 the matter of balancing the equities.

12      A second element of the statutory scheme would appear "by
13 necessary and inescapable inference," id., to require an
14 injunction when its terms have been violated. Under the
15 Statute, when a notice of the right of first refusal has been
16 sent, the recipients of the notice have 180 days to elect to
17 purchase, Cal. Gov't Code § 65863.11(h), and only after the
18 expiration of that period may the Owner sell to others. Cal.
19 Gov't Code § 65863.11(i).

20      The self-evident reason for the statutory delay is to
21 provide those receiving notice the opportunity to evaluate the
22 purchase of the property, its condition, an appropriate price,
23 and arrange for financing. In the absence of such delay, not
24 only can the preservation of a property for low-income use not
25 be assured, a plaintiff seeking injunctive relief will have no
26 way to show that alternative purchasers would in fact be

37

1  available.  Rather, as in the instant case, the best any
2  plaintiff can do is to suggest that there are entities who would
3  be interested and given sufficient opportunity, might purchase
4  the property.  This showing is relatively weak as compared to
5  claims of an actual Buyer pressing for sale.  In sum, a failure
6  to provide the statutory notice distorts the ability of a
7  plaintiff to make a sufficient showing concerning the equities,
8  and thus not only frustrates the "underlying substantive
9  policy," <u>Gambell</u>, 480 U.S. 544, but distorts the equitable
10 consideration of a proper disposition.

11     The court is quite sensitive to the command that "a major
12 departure from the long tradition of equity practice should not
13 lightly be implied." <u>Weinberger v. Romero-Barcelo</u>, 456 U.S.305,
14 320 (1982).  Nonetheless, in the instant matter, the court is
15 convinced that a violation of the State notice and right of
16 first refusal provisions preclude sale of the properties, and
17 thus commands injunctive relief.

18 **D.   BOND**

19     No preliminary injunction shall issue "except upon the
20 giving of security by the applicant, in such sum as the court
21 deems proper, for the payment of such costs and damages as may
22 be incurred or suffered by any party who is found to have been
23 wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).
24 Under the Rule, it is "well settled that Rule 65(c) gives the
25 court wide discretion in the matter of setting security."
26 <u>Natural Resources Defense Counsel v. Morton</u>, 337 F. Supp. 167,

1  168 (D.D.C. 1971)(motion for summary reversal dismissed), 458
2  F.2d 827 (D.C. Cir. 1972). See also  Urbain v. Knapp Bros. Mfg.
3  Co., 217 F.2d 810, 815-16 (6th Cir. 1954); Doyne v. Saettele,
4  112 F.2d 155, 162 (8th Cir. 1940).

5       In considering the appropriate amount of the bond, I note
6  that the named plaintiffs are all person of very moderate means
7  and the organizational plaintiffs are nonprofit corporations.
8  Clearly, if such plaintiffs were "required to post substantial
9  bonds . . . in order to secure preliminary injunctions . . .,"
10 the bonds might undermine mechanisms for private enforcement of
11 the law. Friends of the Earth v. Brinegar, 518 F.2d 322, 323
12 (9th Cir. 1975)(reducing bond in NEPA case from $4,500,000 to
13 $1,000); accord Morton, 337 F. Supp. at 169 (bond set at $100);
14 Environmental Defense Fund v. Corps. of Engineers, 331 F. Supp.
15 925 (D.D.C. 1971)(bond set at $1).

16      I recognize that the Sellers and Buyers have a significant
17 economic stake in the proposed sale.  I take some comfort in the
18 fact that they voluntarily engaged in a highly regulated
19 business clearly impressed with the public interest, and in that
20 sense accepted the risk of missteps leading to suit and
21 injunctive relief.

22      In sum, the court is "unwilling to close the courthouse
23 door in public interest litigation by imposing a burdensome
24 security requirement." State of Ala. ex rel. Baxley v. Corps of
25 Engineers, 411 F. Supp. 1261, 1276 (N.D. Ala.1976).
26 Accordingly, bond is set in the amount of One Dollar.

1        For the foregoing reasons, IT IS HEREBY ORDERED as follows:

2        1.   HUD's motion to dismiss is GRANTED with prejudice;

3        2.   Plaintiff's federal claims against the Owners are

4    dismissed with prejudice;

5        3.   The Owners are ENJOINED from prepaying their mortgages

6    and not renewing their Section 8 contracts until they comply

7    with Cal. Gov't Code § 65863.10-.11, or further order of this

8    court;

9        4.   Bond is set at One Dollar; and

10       5.   The Status Conference in the above-captioned matter is

11   RESET to August 23, 2001 at 9:30 a.m. in Chambers.

12       IT IS SO ORDERED.

13       DATED:   July 2, 2001.

14

15                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
16                              UNITED STATES DISTRICT COURT

17

18

19

20

21

22

23

24

25

26

40

United States District Court
for the
Eastern District of California
July 3, 2001

* * CERTIFICATE OF SERVICE * *

2:01-cv-00832

Kenneth Arms Tenant

    v.

Martinez

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  July 3, 2001, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

            Anne Heather Pearson          SJ/LKK
            Legal Services of Northern California
            515 12th Street
            Sacramento, CA  95814

            Ann M Norton
            PRO HAC VICE
            Housing Preservation Project
            570 Asbury Street
            Suite 103
            St Paul, MN  55103-1852

            Christine R Goepfert
            PRO HAC VICE
            Housing Preservation Project
            570 Asbury Street
            Suite 103
            St Paul, MN  55103-1852

            Timothy L Thompson
            PRO HAC VICE
            Housing Preservation Project
            570 Asbury Street
            Suite 103
            St Paul, MN  55103-1852

John Gann
PRO HAC VICE
Housing Preservation Project
570 Asbury Street
Suite 103
St Paul, MN  55103-1852

John K Vincent
United States Attorney
501 I Street
Suite 10-100
Sacramento, CA  95814

Kendall J Newman
United States Attorney
501 I Street
Suite 10-100
Sacramento, CA  95814

Matthew B Pavone
Courtyard Square
750 Grant Avenue
Suite 250
Novato, CA  94945


                                    Jack L. Wagner, Clerk

                              BY: _____
                                       Deputy Clerk